| | |
|---|---|
| IN THE UNITED STATES DISTRICT COURT | |
| FOR THE NORTHERN DISTRICT OF CALIFORNIA | |

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

DAVID FULGHAM,

    Defendant.
                              /

No. C 12-124 CW

ORDER GRANTING
DEFENDANT'S MOTION
TO SUPPRESS
(Docket No. 15)

Defendant David Fulgham moves to suppress all evidence obtained as a result of the warrantless search of his luggage and its contents on October 22, 2010, and post-arrest statements he made to law enforcement officers. Plaintiff United States of America opposes the motion. Having considered the papers and evidence presented by the parties and their oral arguments at the hearings, the Court GRANTS Defendant's motion.

## BACKGROUND

On October 22, 2010, Steve Arreguin, a supervising officer with the Transportation Security Administration (TSA), was informed that TSA Officers Michael Cole and Robert Johnson had identified a suspicious bag in the TSA baggage screening room at the Oakland Airport. Arreguin Decl. ¶ 3. Officer Arreguin went to the baggage screening room and met Officers Cole and Johnson. Id. at ¶ 4. They told Officer Arreguin that "they had identified a suspicious bag and that an X-ray of the bag revealed a solid mass which resembled explosives." Id. Officer Johnson removed two DVD player boxes from the bag and handed them to Officer Arreguin. Id. at ¶ 5. Officer Arreguin removed one of the DVD

players from its box and looked inside of it through slots on the back of the player. Id. Officer Arreguin saw "small circular objects." Id. Officer Arreguin then had the DVD player rescreened with the X-ray machine, which "confirmed that the DVD player contained a solid mass with small shapes in the sizes of pills." Id. at ¶ 6. He subsequently called Alameda County Deputy Sheriff Robert Covington, who was assigned to work at the Oakland Airport at the time. Id.; Docket No. 21, June 15, 2012 Evidentiary Hearing Transcript (Transcript) 16:14-17:25.

Deputy Covington arrived at the bag screening area at about 5:25 p.m. and met with Officer Arreguin, who related the prior events to him. Covington Incident Report, at DF00009. Deputy Covington viewed an X-ray of the DVD player and saw "a solid mass of tiny cylindrical shapes" inside of it. Id. He requested that the DVD boxes and players be re-screened again using the X-ray machine. Id.[1] He again "could clearly see a solid mass of tiny cylindrical shapes in both DVD boxes and inside both DVD players." Id. He also saw that "the DVD players did not contain any internal electrical components that should be inside a functional DVD player." Covington Decl. ¶ 5.

Deputy Covington wrote in his incident report that the shapes he saw on the X-ray were "consistent with the size and shape of multiple pills." Covington Incident Report, at DF00009. He also

---

[1] In Deputy Covington's incident report and declaration, he stated that he asked for both boxes and DVD players to be re-screened. Covington Incident Report, at DF00009; Covington Decl. ¶ 4. However, he testified that he asked for only one to be re-screened. Docket No. 21, June 15, 2012 Evidentiary Hearing Transcript 8:4-8.

2

clearly stated, "From my training and experience, I recognized that the solid mass was not an explosive but possibly some type of contraband being concealed." Id.

In contrast, in his declaration, Deputy Covington stated, "Based on the x-ray, I did not believe the solid mass was an explosive but could not draw a definitive conclusion." Covington Decl. ¶ 5. He testified at the evidentiary hearing that he did not recognize at the time of the incident that the shapes were consistent with pills and added that detail when he wrote his report later on. Transcript, at 11:7-19. He also did not recall if Officer Arreguin told him that the shapes were consistent with pills. Id. at 22:15-19. In his declaration, in contrast to his earlier investigative report, he stated, "I concluded that I needed to conduct a physical inspection of the inside of the DVD players to ensure that the concealed contraband did not pose a threat to airline safety." Covington Decl. ¶ 5. Deputy Covington testified that, based on the X-ray, he "had no idea" what was inside of the DVD players and that he "did not recognize it to be an explosive from anything" that he previously seen, but that he "had not ruled out that it could be an explosive" at that point. Transcript, at 7:7-8:3; 11:24-12:2. Deputy Covington further testified that, in his training and experience, he had never encountered objects in the shape of pills that were consistent with an explosive or that turned out to be an explosive, but that "explosives and the ability to carry out explosives are consistently are [sic] changing." Id. at 8:19-21, 15:3-7. He gave as examples "previous cases of someone trying to deliver

3

explosives in their shoes" and "through your undergarments or underwear." Id. at 8:23-9:1.

After the further X-rays were completed, Deputy Covington "looked in the vents of the DVD player and saw a mass of circular objects." Covington Decl. ¶ 5. He "unscrewed the top of the DVD player and found four heat-sealed, clear, medium sized plastic bags each filled with a mass of circular objects," which were "consistent with the shapes of pills." Covington Incident Report, at DF00009. "Based on the size, shape, color and packaging of the pills," he "believed them to possibly be Ecstasy, a controlled substance." Id. Deputy Covington then "took possession of the pills in order to test them for being a controlled substance." Id.

Deputy Covington learned that the bag belonged to a passenger named Andres Torres III, who was scheduled to fly from Oakland to Denver. Covington Decl. ¶ 7. Deputy Covington directed Southwest Airlines to page Torres and ask him to return to the security checkpoint for a lost item. Id.

After Torres came to the security checkpoint, Deputy Covington asked him if he had checked any luggage. Id. at ¶ 8. Torres stated that he checked a tan bag containing various items, including "two DVD boxes that have DVD players." Id. Deputy Covington placed Torres under arrest. Id. Two other officers arrived at about 5:56 p.m. Covington Incident Report, at DF00010. Deputy Covington then turned Torres over to one of the other officers to be transported to a local jail. Id.

At the jail, Torres's real name was determined to be David Fulgham. Mora Incident Report, at DF00013. At approximately 7:53

4

p.m., Detectives Mora and Ortiz interviewed Fulgham, and he made incriminating statements. Id.

DISCUSSION

"The Fourth Amendment protects against unreasonable searches and seizures of people and their effects." United States v. McCarty, 648 F.3d 820, 830 (9th Cir. 2011). "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," except in "only limited circumstances in which the usual rule does not apply." United States v. Aukai, 497 F.3d 955, 958 (9th Cir. 2007) (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000)). The Ninth Circuit has recognized that, generally, airport screening searches, which are not based on individualized suspicion, "are constitutionally reasonable administrative searches because they are 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.'" Aukai, 497 F.3d at 960 (quoting United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973).

In McCarty, the Ninth Circuit recently explained the scope of a lawful airport administrative search. "[U]nder federal law, TSA agents could legally search [Defendant's] entire bag for explosives or other safety hazards." 648 F.3d at 831 (citing 49

5

U.S.C. § 44901; 49 C.F.R. § 1540.111(c)).² "However, because warrantless, suspicionless administrative searches remain subject to the Fourth Amendment, a particular search is constitutionally reasonable only where it is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives and where it is confined in good faith to that purpose." Id. (internal quotations and citations omitted). See also United States v. Doe, 61 F.3d 107, 110 (1st Cir. 1995) ("lawful airline security searches of carry-on luggage may not be enlarged or tailored systemically to detect contraband (e.g., narcotics) unrelated to airline security").

"In other words, an airport search remains a valid administrative search only so long as the scope of the administrative search exception is not exceeded; 'once a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale.'" McCarty, 648 F.3d at 831 (quoting United States v. $124,570 U.S. Currency, 873 F.2d 1240, 1246 n.5 (9th Cir. 1989)). "Thus, because TSA screeners are limited to the single administrative goal of searching for possible safety threats related to explosives, the constitutional bounds of an airport administrative search require

---

² The parties have not addressed whether Deputy Covington could properly carry out an administrative search for explosives, although he was not a TSA agent and was instead a local law enforcement officer, or whether the search exceeded the scope of the administrative search exception when Officer Arreguin turned the search over to Deputy Covington. The Court notes that § 44901 provides that "the screening of all passengers and property, including . . . checked baggage" prior to boarding "shall be carried out by a Federal Government employee." 49 U.S.C. § 44901(a).

6

that the individual screener's actions be no more intrusive than necessary to determine the existence or absence of explosives that could result in harm to the passengers and aircraft." Id. at 831 (citing $124,570 U.S. Currency, 873 F.2d at 1245). However, the mere fact that an airport screening procedure reveals contraband other than weapons or explosives does not automatically "'alter the essentially administrative nature of the screening process . . . or render the searches unconstitutional.'" United States v. Marquez, 410 F.3d 612, 617 (9th Cir. 2005) (quoting United States v. Davis, 482 F.2d 893, 908 (9th Cir. 1973)).

In McCarty, the Ninth Circuit considered a situation in which a TSA screener saw that an X-ray device flagged "as a possible safety concern what appeared to be a laptop with a dark mass around it." 648 F.3d at 825. When the TSA screener removed the laptop from the bag, an envelope slid out of the bag as well, spilling out some of the pictures that were inside. Id. at 825-26. She noted that the pictures could have been the dark mass on the X-ray image. Id. at 826. When an X-ray device flags "a dense mass and the screener opens the bag to find a packet of photographs, the screener is required to leaf or thumb through the stack of photographs until she is sure there are no sheet explosives," which are "thin, flat explosives" that "may be disguised as a simple piece of paper or cardboard." Id. at 825. The screener searched through about half of the pictures, which were almost all images of minor children nude or in various states of undress, to ensure there were no safety concerns. Id. at 826. Then, although she was no longer concerned about explosives, the screener read a few lines of letters in the envelope to

7

"'determine what the pictures were all about' and to 'make sure' that the photographs were contraband" before reporting them to her supervisor. Id. She also viewed newspaper clippings contained in the envelope, which discussed minors engaging in sexual activity, and advertised children's underwear and pajamas. Id. at 823, 826.

In reversing the district court's decision to suppress the photographs, the Ninth Circuit held that, for an administrative search undertaken pursuant to a general scheme without individualized suspicion, "as long as (1) the search was undertaken pursuant to a legitimate administrative search scheme; (2) the searcher's actions are cabined to the scope of the permissible administrative search; and (3) there was no impermissible programmatic secondary motive for the search, the development of a second, subjective motive to verify the presence of contraband is irrelevant to the Fourth Amendment analysis." Id. at 834-35. Thus, because the screener reviewed the photographs while searching for explosives, even if the screener developed a secondary desire to investigate whether they were contraband, her review of the photographs themselves was part of a lawful administrative search. Id. at 838. However, because she had already "abandoned the search for safety hazards" by the time she viewed the letters, advertisements and newspaper articles, those search actions "clearly fell outside the permissible scope of the lawful administrative search and violated McCarty's Fourth Amendment rights because they were more extensive and intrusive than necessary to detect air travel safety concerns." Id. at 836.

Here, Deputy Covington's incident report, completed three days after the search, clearly states that he concluded that "the

solid mass was not an explosive" after viewing the X-rays and before he looked into the vents of the DVD player and unscrewed the top of the DVD player. Covington Incident Report, at DF00009. The Court concludes that Deputy Covington's later testimony and declaration, given more than a year and a half after the incident for the purposes of the instant motion, which contradict the report he wrote only shortly after the events actually took place, less accurately described his state of mind at the relevant time. Deputy Covington provided no explanation of why he would have written this in his incident report if it were not true, and testified only that he "meant to say" that "I did not recognize it to be an explosive from anything that I had seen before," but that "at that point, I had not ruled out that it could be an explosive." However, this can be not reconciled with his clear statement in the report that, based on his "training and experience," he "recognized that the solid mass was not an explosive." Transcript, at 7:12-8:3. He did not state that it was probably not an explosive or that it was not an explosive that he recognized. If Deputy Covington believed that the mass could have been an explosive at that point, he would not have said otherwise in his report.

The other circumstances further support the Court's finding. During the evidentiary hearing, Deputy Covington repudiated his description in the incident report of the "solid mass of tiny cylindrical shapes" that he saw on the X-ray images as "consistent with the size and shape of multiple pills," stating that he had not recognized the "tiny cylindrical shapes" to be consistent with pills until later on. Id. at 11:7-19. Deputy Covington also

9

testified that the solid mass may have been an explosive with which he was unfamiliar, yet he opened up the DVD player without taking any safety precautions or utilizing the bomb-sniffing dog that he testified was at the screening area.

Because Deputy Covington had already concluded that the dark mass was not a safety hazard before he opened the top of the DVD player, that search fell outside the permissible scope of the lawful administrative search and violated Defendant's Fourth Amendment rights.

The Court finds that suppression of the evidence found as a result of this search is warranted. The government does not argue that any exception to the suppression rule applies. Further, exclusion would result in deterrence of deliberate, reckless, or grossly negligent conduct. See Herring v. United States, 555 U.S. 135, 144 (2009). Deputy Covington made a clear error in continuing to search Defendant's possessions without securing a warrant, after he had concluded that the luggage did not contain explosives that would jeopardize air travel safety. Exclusion would deter other officers from engaging in the same conduct.

The government concedes that Defendant's post-arrest statements were the fruit of the search of the DVD players and that the Court's suppression of evidence found as a result of that search "would also apply to the defendant's post-arrest statements." Docket No. 22, 2.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's motion to suppress evidence obtained as a result of the

warrantless search of his luggage and its contents and his post-arrest statements (Docket No. 15).

IT IS SO ORDERED.

Dated: July 5, 2012

CLAUDIA WILKEN
United States District Judge